1  SCOTT N. SCHOOLS
   Acting United States Attorney
2  CHARLES M. O'CONNOR (CA State Bar No. 56320)
   Assistant United States Attorney
3  450 Golden Gate Ave., 10th Floor
   San Francisco, California 94102
4  Tel:    (415) 436-7180

5  RONALD J. TENPAS
   Acting Assistant Attorney General
6  Environment and Natural Resources Division
   PAMELA S. TONGLAO
7  Trial Attorney
   U.S. Department of Justice
8  Environmental Defense Section
   P.O. Box 23986
9  Washington, D.C. 20026-3986
   Tel:    (202) 305-0897
10 Fax:    (202) 514-8865
   Email: pamela.tonglao@usdoj.gov

11

12 ATTORNEYS FOR DEFENDANTS

13              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF CALIFORNIA
14                  SAN FRANCISCO DIVISION

15

16 COMMUNITIES FOR A BETTER              )   Case No.  C 07-3678 JSW
   ENVIRONMENT, ROCKY MOUNTAIN          )
17 CLEAN AIR ACTION, COALITION FOR      )
   A SAFE ENVIRONMENT, and              )
18 PHYSICIANS FOR SOCIAL                )   DEFENDANTS' MEMORANDUM IN
   RESPONSIBILITY-LOS ANGELES,          )   OPPOSITION TO PLAINTIFFS'
                                        )   MOTION FOR SUMMARY
19                                      )   JUDGMENT AND IN SUPPORT OF
                Plaintiffs,             )   EPA'S CROSS-MOTION FOR
20                                      )   SUMMARY JUDGMENT
        v.                             )   CONCERNING REMEDY
21                                      )
                                        )
22 UNITED STATES ENVIRONMENTAL         )   Date:   February 22, 2008
   PROTECTION AGENCY, and STEPHEN      )   Time:  9:00 a.m.
23 L. JOHNSON, Administrator of the United )   Place: Courtroom 2, 17th floor
   States Environmental Protection Agency, )
24                                      )
                Defendants.            )
25                                      )
   _____)
26

27

28

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.    STATUTORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.   THE NAAQS REVIEW PROCESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.    The Scientific Assessment Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.    The Rulemaking Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.  THE CARBON MONOXIDE NAAQS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I.    THIS COURT SHOULD ADOPT THE SCHEDULE PROPOSED BY EPA; ANY
      SHORTER SCHEDULE WOULD UNDERMINE EPA'S ABILITY TO
      PROMULGATE SCIENTIFICALLY SOUND STANDARDS . . . . . . . . . . . . . . . . . . 13

II.   THE COURT SHOULD REJECT PLAINTIFFS' PROPOSED REMEDY . . . . . . . . . 16

      A.    Plaintiffs' Schedule Is Unreasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      B.    Plaintiffs Request Relief Beyond That Authorized by Statute . . . . . . . . . . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                    i

# TABLE OF AUTHORITIES

## CASES

*Alabama Power Co. v. Costle,* 636 F.2d 323 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*American Trucking Ass'ns v. EPA*, 175 F.3d 1027 (D.C. Cir.),
    *reh'g granted in part & denied in part*, 195 F.3d 4 (D.C. Cir. 1999),
    *aff'd in part and rev'd in part, sub nom., Whitman v. American Trucking Ass'ns,*
    531 U.S. 457 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*American Lung Ass'n v. Browner*, 884 F. Supp. 345 (D. Ariz. 1994) . . . . . . . . . . . . . . . . . . . 18

*American Trucking Ass'ns v. EPA*, 175 F. 3d 1027 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . 5, 19

*American Trucking Ass'ns, Inc. v. EPA*, 283 F.3d 355 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . 17

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Army & Air Force Exch. Serv. v. Sheehan*, 456 U.S. 728 (1982) . . . . . . . . . . . . . . . . . . . . . . 20

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Cronin v. Browner*, 90 F. Supp. 2d 364 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Environmental Defense Fund v. Thomas*, 627 F. Supp. 566 (D.D.C. 1986) . . . . . . . . . . . . . . 11

*First Virginia Bank v. Randolph*, 110 F.3d 75 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . 20

*Gov't of Guam v. Am. President Lines*, 28 F.3d 142 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . 22

*Hallstrom v. Tillamook County*, 493 U.S. 20 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Idaho Sportsmen's Coalition v. Browner*, 951 F. Supp. 962 (W.D. Wash. 1996) . . . . . . . . . . . 11

*Lane v. Pena*, 518 U.S. 187, 192 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

*Maine Ass'n of Handicapped Persons v. Dole*, 623 F. Supp. 920 (D. Me. 1985) . . . . . . . . . . . 11

*Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1 (1981) . . . . . . . . 21

*Missouri Coalition for the Environment v. EPA*, No. 4:04-cv-660,
    2005 WL 2234579 (E.D. Mo. Sept. 14, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Natural Res. Def. Council v. EPA*, 902 F.2d 962 (D.C. Cir. 1990),
    *vacated in part*, 921 F.2d 326 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Natural Res. Def. Council v. Train*, 510 F.2d 692 (D.C. Cir. 1975) . . . . . . . . . . . . . . . 10, 12, 13

*Sierra Club v. Gorsuch*, 551 F. Supp. 785 (N.D. Cal. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Sierra Club v. Thomas*, 658 F. Supp. 165 (N.D. Cal. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 10-12

*Sierra Club v. Thomas*, 828 F.2d 783 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                                   ii

1   *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979) . . . . . . . . . . . . . . . . . . . . 21

2   *United States Dep't of Energy v. Ohio ("DOE v. Ohio")*, 503 U.S. 607 (1992) . . . . . . . . . . . . 20

3   *United Steelworkers of America v. Rubber Mfrs. Ass'n,*
    783 F.2d 1117 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
4
    *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council,*
5   435 U.S. 519 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

6   *Whitman v. American Trucking Ass'ns,* 531 U.S. 457 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 5

7   **STATUTES**

8   Clean Air Act ("CAA"), 42 U.S.C. §§ 7401-7671q . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

9   42 U.S.C. § 7401(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

10  42 U.S.C. § 7407(d)(1)-(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

11  42 U.S.C. § 7408(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

12  42 U.S.C. § 7408(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

13  42 U.S.C. § 7408(a)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

14  42 U.S.C. § 7409(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

15  42 U.S.C. § 7409(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 4, 13, 23

16  42 U.S.C. § 7409(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

17  42 U.S.C. § 7409(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-3, 5, 12, 14

18  42 U.S.C. § 7409(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

19  42 U.S.C. § 7409(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

20  42 U.S.C. § 7410 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

21  42 U.S.C. § 7604(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 20, 21

22  42 U.S.C. § 7607(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

23  42 U.S.C. § 7607(d)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8

24  42 U.S.C. § 7607(d)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

25  42 U.S.C. § 7607(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

26  29 U.S.C. §§ 791-794(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

27

28

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                          iii

**FEDERAL REGULATIONS**

40 C.F.R. § 50.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**FEDERAL REGISTER**

59 Fed. Reg. 38,906 (Aug. 1, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

62 Fed. Reg. 38,652 (July 18, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

72 Fed. Reg. 52,369 (Sept. 13, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 95-294 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1077 . . . . . . . . . . . . . . . . . . . . 12

H.R. Rep. No. 95-564 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1502 . . . . . . . . . . . . . . . . . . . . 12

H.R. Rep. No. 106-988 (2000) (Conf. Rep.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

S. Rep. No. 106-410 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                    iv

# INTRODUCTION

This Memorandum is filed in support of the cross-motion on remedy pursuant to Rule 56 of the Federal Rules of Civil Procedure filed by Defendants United States Environmental Protection Agency and Stephen L. Johnson (collectively, "EPA" or the "Agency"). It also responds to the summary judgment motion filed on November 16, 2007, by Plaintiffs Communities for a Better Environment, Rocky Mountain Clean Air Action, Coalition for a Safe Environment, and Physicians for Social Responsibility-Los Angeles. In this Memorandum, EPA explains why the Court should resolve this case by issuing an order enjoining EPA to satisfy its non-discretionary duties under the Clean Air Act ("CAA" or the "Act") by: (1) issuing a final science assessment document for carbon monoxide on or before May 28, 2010; and (2) (a) signing on or before October 28, 2011, one of the following: (i) a proposed rule containing new standards or revisions to the national ambient air quality standards for carbon monoxide as may be appropriate in accordance with 42 U.S.C. § 7409(b), or (ii) a proposed or final determination not to revise such standards; and (b) signing on or before July 27, 2012, a final rule containing new standards or revisions to the national ambient air quality standards for carbon monoxide as may be appropriate in accordance with 42 U.S.C. § 7409(b), unless a final determination not to revise such standards has been issued on or before July 27, 2012.

This action was brought by Plaintiffs under the citizen suit provision of the CAA, 42 U.S.C. § 7604(a)(2), to compel EPA to review, and, if appropriate, revise the existing air quality criteria and national ambient air quality standards ("NAAQS") for carbon monoxide ("CO"), pursuant to section 109(d) of the Act, 42 U.S.C. § 7409(d). Plaintiffs filed their complaint on July 17, 2007. On October 9, 2007, EPA answered the complaint and admitted that it had missed the statutory deadline for performing the tasks mandated by CAA section 109(d), 42 U.S.C. § 7409(d). These cross-motions for summary judgment on remedy followed.

Carbon monoxide is produced by both natural and anthropogenic sources. Declaration of Stephen D. Page ("Page Decl.") ¶ 38. Carbon monoxide is formed as a result of incomplete combustion, *i.e.*, when carbon in fuel is not burned completely. *Id.* The largest anthropogenic

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                    1

1  source of CO is motor vehicle exhaust.  *Id.* ¶ 43.  At elevated concentrations, CO is known to

2  adversely affect human health.  *Id.* ¶ 38.  EPA last completed a review of the CO NAAQS in

3  1994.  *Id.* ¶ 39.[1]/  Since that time, anthropogenic emissions of CO have declined substantially,

4  resulting in significantly lower ambient concentrations of CO nationwide.  *Id.*  ¶ 40.  Ambient

5  levels of CO decreased by 62 percent between 1990 and 2006.  *Id.*  This significant improvement

6  in ambient air quality is largely attributable to EPA's regulatory efforts to reduce CO emissions

7  from mobile and stationary sources.  *Id.* ¶ 41.

8       Data from air quality monitors show that ambient CO levels are well below the CO

9  NAAQS, which is currently set at 9 parts per million ("ppm").[2]/ *Id.* ¶¶ 39-40.  At 90 percent of

10  the monitors in the nation, the actual carbon monoxide concentration measures 3 ppm or less,

11  and the average CO concentration nationwide is 2 ppm.  *Id.* ¶ 40.  Only one area in the country

12  exceeded the CO NAAQS based on the most recent monitoring data available to EPA

13  (2005-2006).[3]/  *Id.*

14       EPA is committed to carrying out and completing such a review as rapidly as possible,

15  consistent with satisfying applicable legal requirements and ensuring a sound and scientifically

16  supportable decision.  Page Decl. ¶ 49.  Toward that end, EPA has made a rigorous assessment of

17  the minimum amount of time needed to accomplish each task required in reviewing  the air

18

19  [1]/    EPA issued a revised criteria document for CO in June 2000 but, as explained below, did
20  not complete a review of the NAAQS based on that criteria document.  Page Decl. ¶ 44.

21  [2]/    This 9 ppm NAAQS for CO is not to be exceeded more than once per year and is
22  calculated as an average of values measured over an eight-hour period (the "8-hour average").  40
   C.F.R. § 50.8.  The CO NAAQS also has a standard of 35 ppm not to be exceeded more than
23  once per year, calculated as an average value over one hour (the "1-hour standard").  *Id.*  This
   standard is designed to prevent unhealthy short-term spikes in CO levels, but, since these levels
24  are not typically experienced in the United States, the 8-hour standard is considered the standard
25  of concern for attainment purposes.  Page Decl. ¶ 39 n. 9.

26  [3]/    In addition, with the exception of four metropolitan areas, all areas that were designated
   as not in attainment of the CO NAAQS (called "nonattainment areas") following the
27  promulgation of the 1990 Clean Air Act Amendments have since met the requirements of the CO
   NAAQS and have been formally redesignated as attainment areas.  Page Decl. ¶ 40.
28

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                    2

1  quality criteria and NAAQS. *Id.* ¶¶ 49-65. EPA developed a projected schedule based on its

2  experience with prior NAAQS reviews for other pollutants and by building on efforts in the

3  Agency to accelerate and streamline this process. *Id.* ¶ 59. The schedule also reflects EPA's

4  expert judgment on the complexity of the scientific and policy issues regarding CO that will need

5  to be addressed at nearly every stage of the analysis. *Id.* ¶¶ 54-59. Based on this assessment,

6  EPA projects that it can (1) issue a final science assessment document for CO by May 28, 2010[4]/;

7  and (2) (a) sign on or before October 28, 2011, one of the following: (i) a proposed rule

8  containing new standards or revisions to the CO NAAQS as may be appropriate in accordance

9  with 42 U.S.C. § 7409(b), or (ii) a proposed or final determination not to revise such standards;

10  and (b) sign on or before July 27, 2012, a final rule containing new standards or revisions to the

11  CO NAAQS as may be appropriate in accordance with 42 U.S.C. § 7409(b), unless a final

12  determination not to revise such standards has been issued on or before July 27, 2012. *Id.* ¶ 50.

13  In light of the sequenced nature of the NAAQS review, a shorter timetable would necessitate

14  procedural and/or analytical shortcuts in the critical initial phase of collecting, evaluating, and

15  integrating the pertinent scientific data and studies. By forcing the Agency to curtail the depth

16  and breadth of its review, as well as the review of the statutorily-mandated independent scientific

17  review committee, *see id.* ¶¶ 59-60, a shorter timetable could jeopardize the integrity of any

18  proposed revisions to the air quality criteria and NAAQS, which would have the ultimate effect

19  of delaying the implementation of any revised NAAQS if the NAAQS were successfully

20  challenged in court. For these reasons, EPA does not consider a shorter timetable to be feasible

21  or reasonable. EPA requests that its motion for summary judgment on remedy be granted, and

22  that the Court enter an order adopting EPA's proposed schedule.

23

24

25

26

---

27  [4]/    Under the revised NAAQS review process, the final science assessment document is

28  issued in place of the criteria document. Page Decl. ¶ 27.

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                    3

# BACKGROUND

## I.    STATUTORY BACKGROUND

The Clean Air Act, 42 U.S.C. §§ 7401-7671q, enacted in 1970 and extensively amended in 1977 and 1990, is intended to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare." 42 U.S.C. § 7401(b)(1). The Clean Air Act sets up a comprehensive and extraordinarily detailed program for control of air pollution through a system of shared federal and state responsibility.

National Ambient Air Quality Standards ("NAAQS") are a central element of the Clean Air's program for control of air pollution. Sections 108 and 109 of the Act, 42 U.S.C. §§ 7408-09, require EPA to establish NAAQS for certain air pollutants – commonly referred to as "criteria pollutants" – that "cause or contribute to air pollution that may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7408(a)(1)(A). Currently there are NAAQS for six air pollutants: particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead. The NAAQS establish permissible concentrations of these pollutants in the "ambient," or outside, air. EPA must establish primary NAAQS "requisite to protect" public health with "an adequate margin of safety," and secondary NAAQS "requisite to protect" public welfare from adverse effects, including effects on soils, water, crops, vegetation, visibility, climate, and property values. 42 U.S.C. § 7409(b). States must then establish State Implementation Plans, which impose controls on individual sources of air pollution as necessary to attain and maintain the NAAQS within their borders. 42 U.S.C. § 7410.

Both primary and secondary NAAQS must be based on "air quality criteria" developed by EPA. 42 U.S.C. §§ 7409(b)(1) and (d)(1). Air quality criteria must reflect the latest scientific knowledge on "all identifiable effects on public health or welfare" that may result from a pollutant's presence in the ambient air. *Id.* § 7408(a)(2). Historically, EPA has set forth air quality criteria in "criteria documents" – which are comprehensive, multi-volume, assessments of relevant medical, scientific, and technical information. The most recent criteria document for lead, for example, is well over 2,000 pages in length. Page Decl. ¶ 12.

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                          4

1    To ensure that NAAQS will keep pace with advances in scientific knowledge, section

2    109(d) of the Act, 42 U.S.C. § 7409(d), requires that EPA complete a review and make

3    appropriate revisions, at five-year intervals, of both the air quality criteria and the NAAQS for

4    each applicable pollutant.  Under the Act, an independent scientific review committee must

5    advise the Administrator on revision of the air quality criteria and standards.  42 U.S.C. §

6    7409(d)(2).  This important function is fulfilled by the Clean Air Scientific Advisory Committee

7    ("CASAC") of EPA's Science Advisory Board.  CASAC's advice and recommendations play a

8    significant role throughout the standard-setting process.  When EPA proposes to establish or

9    revise existing NAAQS, it must "set forth or summarize and provide a reference to any pertinent

10   findings, recommendations, and comments by [CASAC]."  42 U.S.C. § 7607(d)(3).  If EPA

11   proposes action that "differs in any important respect from any of these recommendations," the

12   Agency must provide an explanation of the reason for such differences."  *Id.*

13   **II.    THE NAAQS REVIEW PROCESS**

14   Because of their extraordinary environmental, public health, social, and economic

15   importance, NAAQS typically are vigorously contested by industry, States, and public interest

16   groups.[5]  EPA always strives to make sound, well-reasoned decisions, but it is especially critical

17   that it do so when establishing or revising NAAQS.  Page Decl. ¶ 7.  Almost by definition,

18   however, the key data on which EPA must rely in such decisions are essentially reports from the

19   frontiers of scientific research, where both the methodologies and the results of key studies are

20   often controversial, and where highly regarded scientists often reach markedly different

21   conclusions in assessing their significance.  *Id.*; *see also Natural Res. Def. Council v. EPA*, 902

22   F.2d 962, 968 (D.C. Cir. 1990), *vacated in part*, 921 F.2d 326 (D.C. Cir. 1991).  In view of the

23   uncertainties in these data, as well as the enormous volume of scientific research currently

24   ─────────────────────

25   [5]    The 1997 NAAQS for particulate matter, for example, were challenged by all these

26   groups, as well as certain members of Congress (as *amici*).  *American Trucking Ass'ns v. EPA*,
     175 F.3d 1027, 1055-56 (D.C. Cir.), *reh'g granted in part & denied in part*, 195 F.3d 4 (D.C.

27   Cir. 1999), *aff'd in part and rev'd in part, sub nom.*, *Whitman v. American Trucking Ass'ns*, 531

28   U.S. 457 (2001).

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                                    5

1   focused on major air pollutants, sound decisions on revision of existing NAAQS must be made

2   through a highly rigorous process designed to address what are often very complex issues of

3   science, policy, and law.  Page Decl. ¶ 7.

4        Reviewing air quality criteria and NAAQS for a pollutant involves two principal phases:

5   (1) a scientific assessment phase, and (2) a regulatory development phase.  These phases are

6   discussed generally below, and with greater particularity in the accompanying declarations of

7   Stephen Page, Dr. Mary Ross, and Dr. Karen Martin.

8            **A.    The Scientific Assessment Phase**

9        The scientific assessment phase includes the review and appropriate revision of air

10  quality criteria.  Page Decl. ¶ 12.  This process involves a comprehensive analysis of the relevant

11  science, including the chemistry of CO, sources of ambient pollutant levels, toxicological and

12  epidemiological studies, and other information on the impact of the pollutant on health and

13  welfare.  *Id.* ¶ 12.  In this phase, EPA will conduct an extensive review of epidemiological

14  studies, toxicological studies, studies of  natural and anthropogenic sources of CO.   This will

15  include review of epidemiological studies that address the relationship between ambient CO and

16  a range of health outcomes, including mortality, cardiovascular health effects, and low

17  birthweight, including those studies identified by Plaintiffs as well as other studies that show an

18  absence of any correlation.  Declaration of Dr. Mary Ross in Support of EPA's Cross-Motion for

19  Summary Judgment ("Ross Decl.") ¶ 4.  EPA will evaluate the methodological strengths and

20  weaknesses of the various studies, (*e.g.*, evaluating whether and how studies have accounted for

21  possible confounding factors, such as other pollutants in motor vehicle exhaust, or indoor CO

22  exposure) to identify and synthesize the current state of scientific knowledge on CO.

23       By statutory design, CASAC plays an integral and active advisory role in this phase of the

24  process, providing a critically important, high level scientific peer review of EPA's efforts.  Page

25  Decl. ¶¶ 16-17, 30.  In reviewing drafts of the science assessment documents, the CASAC panel

26  examines in detail the appropriateness and completeness of the scientific information in

27  successive drafts, the accuracy of the characterization of that information, and the scientific

28

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                    6

1   soundness of conclusions. *Id.* ¶ 16. EPA also receives detailed comments from the public during

2   this process. In view of the size and significance of the documents being reviewed, EPA gives

3   CASAC and the public approximately 60 days to review the documents before asking for

4   comments on them. *Id.* ¶ 55.

5          While the science assessment is underway, EPA intends to begin the exposure/risk

6   assessment for CO. This assessment evaluates patterns of exposure to ambient CO, and, if

7   scientifically appropriate based on the science assessment, includes a quantitative risk assessment

8   of the relationship between varying ambient levels of CO and different adverse effects.

9   Developing an adequate methodology for this assessment is critical to having an adequate basis

10  for the Administrator's ultimate judgment in "bridging the gap" between the science assessment

11  on CO and the decision to retain or revise the NAAQS.

12         **B.     The Rulemaking Phase**

13         Based on the information and judgments in the integrated science assessment and the

14  results of the exposure/risk assessment, and taking into account CASAC and public comments on

15  those documents, EPA will prepare a policy assessment and publish it as an advance notice of

16  proposed rulemaking ("ANPR") for the CO NAAQS review.[6]/ Page Decl. ¶ 57. In consultations

17  with CASAC regarding measures to strengthen the NAAQS review process, EPA agreed to issue

18  a second draft of the exposure/risk assessment for CASAC review and a final exposure/risk

19  assessment before issuing the ANPR. *Id.* ¶ 25.3. While the preparation of the ANPR is expected

20  to partly overlap with the completion of the exposure/risk assessment, EPA and CASAC believed

21  that staggering these two phases would enhance the overall review process by allowing CASAC

22  and the public to provide more meaningful input to the Administrator both on the exposure/risk

23  assessment and on the ANPR. *Id.*

24         Any proposal to revise the NAAQS is governed by special rulemaking procedures set

25  forth in section 307(d) of the Act, 42 U.S.C. § 7607(d). EPA's notice of proposed rulemaking

26  _____

27  [6]/    The policy assessment contained in the ANPR was formerly contained in a document

28  known as a "staff paper," issued by EPA's Office of Air Quality Planning and Standards.

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                              7

must be accompanied by a detailed statement of its basis and purpose, including the factual data
on which the proposal is based and the methodology used in obtaining and analyzing the data. 42
U.S.C. § 7607(d)(3). In the case of NAAQS, section 307(d)(3), 42 U.S.C. § 7607(d)(3),
specifically requires that the proposal set forth or summarize CASAC's advice and explain any
significant departures from it.

As in other proceedings under section 307(a), EPA must provide at least 30 days for
public comment on the proposal. 42 U.S.C. § 7607(h). EPA must also provide an opportunity
for oral presentation of comments, keep a transcript of any public hearing, and hold the record of
the proceeding open for an additional 30 days to provide an opportunity for submission of
rebuttal and supplementary information. 42 U.S.C. § 7607(d)(5). In the past a period of 90 or
more days has often been allowed for NAAQS proposals, given their importance, the complexity
of the issues, the large number of scientific publications underlying the proposed standards, and
the intense public interest generated by the proposals. Page Decl. ¶ 35.

## III.    THE CARBON MONOXIDE NAAQS

In 1971, EPA promulgated identical primary and secondary NAAQS for CO under
section 109(a) of the Act, 42 U.S.C. § 7409(a). Page Decl. ¶ 39. Each standard had two
components: an eight-hour average set at 9 ppm and a one-hour average set at 35 ppm. *Id*. EPA
has twice completed an extensive review of the air quality criteria and NAAQS for CO under
section 109(d)(1) of the Act, 42 U.S.C. § 7409(d)(1). *Id*. During the late 1970s and early 1980s,
EPA reviewed the CO NAAQS and related air quality criteria. *Id*. Upon conclusion of that
review, EPA decided not to revise the primary CO NAAQS. *Id*. EPA further decided to revoke
the secondary CO NAAQS. *Id*. During the late 1980s and early 1990s, EPA again reviewed the
CO NAAQS pursuant to section 109(d)(1) of the Act. With full involvement of CASAC and the
public, this review led to publication of a revised criteria document in 1991 and a staff paper in
1992. *Id*. In 1994, after consideration of those documents, EPA determined that revision of the
existing NAAQS was not appropriate. *Id*.; 59 Fed. Reg. 38,906 (Aug. 1, 1994).

Since 1994, there has been a marked decline in the amount of CO emitted into the air

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                                8

1    across the nation.  From 1990 to 2006, the average ambient concentration of CO decreased by 62

2    percent, principally as a result of regulations aimed at reducing CO emissions from mobile and

3    stationary sources. Page Decl. ¶¶ 40-41.  In other words, ambient air quality has improved due to

4    the efficacy of regulations that limit emissions of CO at its source.  EPA anticipates that further

5    reductions in CO emissions will be achieved upon implementation of regulations that the Agency

6    has promulgated in the last several years, including rules that require the use of advanced

7    emissions control technology for gas and diesel-powered engines.  *Id.* ¶ 43.

8        Since completing the last review of the NAAQS for CO in 1994, EPA has gathered

9    additional information concerning the health effects of CO and has prepared to undertake the

10   subsequent NAAQS review.  During 1998 and 1999, EPA's National Center for Environmental

11   Assessment prepared drafts of a CO criteria document, which were reviewed by CASAC and the

12   public.  A final CO criteria document was published in June 2000.  *Id.*  ¶ 44.  Completion of

13   EPA's review of the CO NAAQS was delayed as a result of direction from Congress that EPA

14           contract, within 30 days of enactment of this Act, with the National Academy of
             Sciences or other appropriate entity for a study of carbon monoxide episodes in
15           meteorological and topographical problem areas, addressing the role of cold
             weather inversions and addressing public health significance and strategies,
16           including the use of catalytic converter and other cold-start technology, for
             managing these rare occurrences in national ambient air quality standards
17           non-attainment areas, due mostly to cold-weather inversions.

18   H.R. Rep. No. 106-988,  at 121 (2000) (Conf. Rep.); *see also* S. Rep. No. 106-410, at 81 (2000).

19   Given the overlap between the substance of the carbon monoxide study and the review of the air

20   quality criteria, EPA postponed further review of the CO NAAQS until after completion of the

21   required study.[7/] Page Decl. ¶ 44.  This study was conducted between 2000 and 2003 and was

22   published in April 2003.  *Id.*  At that time, EPA was heavily involved in reviews of the NAAQS

23   for PM and ozone and lacked sufficient resources to complete a contemporaneous review of the

24   CO NAAQS.  *Id.*

25   _____

26   [7/]    *See* 42 U.S.C. § 7408(a)(2)(A) (requiring Administrator to issue air quality criteria that
        include "those variable factors (including atmospheric conditions) which of themselves or in
27      combination with other factors may alter the effects on public health and welfare of such air
        pollutant").

28

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                    9

1    Prior to the receipt of Plaintiffs' notice of intent to sue in this action, EPA had taken steps

2    toward initiating a new review of the CO NAAQS.  *Id.*  Upon receiving Plaintiffs' notice of

3    intent to sue, EPA accelerated the pace of its activities.  *Id.*  EPA commenced review of the CO

4    NAAQS on September 13, 2007, when it issued a call for information in the *Federal Register*.

5    *See* 72 Fed. Reg. 52,369 (Sept. 13, 2007).

6                              **STANDARD OF REVIEW**

7    Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

8    "shall be rendered forthwith if the pleadings, . . . together with the affidavits, if any, show that

9    there is no genuine issue as to any material fact and that the moving party is entitled to a

10   judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 n.4 (1986) (citing

11   *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247 (1986)).

12   In a suit alleging violation of a Congressionally mandated duty, courts have recognized

13   two types of circumstances that might make it infeasible for an agency to comply with a

14   particular deadline: (1) budgetary and manpower constraints, and (2) the need for an agency to

15   have more time to sufficiently evaluate complex technical issues.  *Natural Res. Def. Council v.*

16   *Train*, 510 F.2d 692, 712-13 (D.C. Cir. 1975).  With respect to the latter, "[t]he public has a

17   significant interest in ensuring that the government does not promulgate rules via a process that

18   emphasizes expediency over quality and accuracy."  *Cronin v. Browner*, 90 F. Supp. 2d 364, 373

19   (S.D.N.Y. 2000).  Moreover, the public interest in sound regulations that will survive judicial

20   review "is of paramount importance."  *Sierra Club v. Thomas*, 658 F. Supp. 165, 172 (N.D. Cal.

21   1987).  Accordingly, "it would be inappropriate to set an infeasible schedule in order to punish a

22   delinquent agency."  *Id*.  "Indeed, by decreasing the risk of later judicial invalidation and remand

23   to the agency, additional time spent reviewing a rulemaking proposal before it is adopted may

24   well ensure earlier, not later, implementation of any eventual regulatory scheme."  *Sierra Club v.*

25   *Thomas*, 828 F.2d 783, 798-99 (D.C. Cir. 1987).  *See also United Steelworkers of America v.*

26   *Rubber Mfrs. Ass'n*, 783 F.2d 1117, 1120 (D.C. Cir. 1986) (holding judicial imposition of overly

27   hasty timetable on agency would ill serve the public interest); *Maine Ass'n of Handicapped*

28

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                    10

1  *Persons v. Dole*, 623 F. Supp. 920, 926 (D. Me. 1985) (recognizing "the need to implement clear

2  and effective regulations capable of withstanding the scrutiny of challenges following

3  enactment.").  In short, when an agency has missed a statutory deadline, a court should examine

4  the relevant facts and circumstances and evaluate the time frame needed by the agency to make

5  well-reasoned, scientifically supportable, and defensible decisions.

6      Plaintiffs distort the governing standard in suggesting that EPA bears the burden of

7  demonstrating that compliance with Plaintiffs' preferred schedule is impossible.  Pl. Mem. at 8-9.

8  None of the cases cited by Plaintiffs stands for this proposition.  The burden of establishing

9  impossibility applies when EPA requests time to comply that exceeds the period that Congress

10  contemplated in the statute.  *See Sierra Club v. Thomas*, 658 F. Supp. at 171 ("The burden on an

11  agency of establishing impossibility or infeasibility of issuing regulations *within the statutory*

12  *time frame* is heavy.") (emphasis added)); *accord Alabama Power Co. v. Costle*, 636 F.2d 323,

13  359-60 (D.C. Cir. 1980) (applying impossibility standard where EPA sought "vindication of an

14  approach contrary to the explicit statutory design on the basis of its estimate of its lack of

15  capacity to handle the task delegated to it").  Here, an affirmative showing of impossibility is not

16  required because, as explained below, EPA proposes to accomplish the required tasks in less time

17  than afforded by the statute.  Thus, Plaintiffs are incorrect in asserting that the impossibility

18  analysis "applies equally to the CO review process in this case."  Pl. Mem. at 8.  The applicable

19  standard is not one of impossibility, but of reasonableness.  *See Idaho Sportsmen's Coalition v.*

20  *Browner*, 951 F. Supp. 962, 968-69 (W.D. Wash. 1996) (declining to adopt plaintiff's proposed

21  schedule even though EPA did not show that plaintiff's schedule was impossible and instead

22  remanding to EPA to establish a "reasonable schedule" for accomplishing nondiscretionary

23  duty); *Environmental Defense Fund v. Thomas*, 627 F. Supp. 566, 567 (D.D.C. 1986) ("The only

24  real dispute is by which deadline EPA can reasonably be ordered to promulgate final

25  standards.").

26      In two cases from this district involving claims that EPA failed to timely perform a

27  nondiscretionary duty under the Clean Air Act, courts have ordered EPA to carry out its

28

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                    11

1

obligation within the time frame specified in the statute.  In *Sierra Club v. Thomas*, 658 F. Supp.

2

165, the court held:

3

> [I]f the statutory deadline has passed by the time the court issues its decree, the
> EPA remains obligated to issue regulations within the time frame mandated by
> Congress.  If, for example, the Act requires EPA to adopt regulations within 180
> days of a particular date and that deadline passes without EPA taking any action,
> the court, in the absence of a showing of impossibility, will order EPA to issue
> regulations in 180 days.

4

5

6

*Id.* at 171.  *Accord Sierra Club v. Gorsuch*, 551 F. Supp. 785, 789 (N.D. Cal. 1982) (ordering

7

EPA to propose emission standards within 180 days, consistent with mandate in 42 U.S.C. §

8

7412(b)(1)(A) and (B) to propose such standards within 180 days); *Sierra Club v. Thomas,* 658

9

F. Supp. at 174  ("It is not for the Court . . . to determine the briefest possible time frame for

10

completing the rule making.  Congress has already determined that two years is an appropriate

11

period.").

12

**ARGUMENT**

13

EPA acknowledges that more than five years have elapsed since EPA last concluded a

14

review of the air quality criteria for CO and related NAAQS.  Accordingly, pursuant to section

15

109(d)(1) of the Act, 42 U.S.C. § 7409(d), EPA has a nondiscretionary duty to perform the

16

following tasks: (1) complete a "thorough review" of the air quality criteria and NAAQS for CO,

17

and (2) make such revisions in the criteria and NAAQS and promulgate such new standards as

18

may be appropriate.  The Court may properly enter an order setting deadlines for EPA to perform

19

these obligations.  *See Train*, 510 F.2d at 713.  In exercising its discretion to establish appropriate

20

deadlines, this Court should consider the five-year time frame Congress envisioned for NAAQS

21

review,[8]/ the importance of ensuring that any revised standards ultimately adopted can withstand

22

challenge, and what is feasible.  *Id.*

23

24

25

[8]/    Congress considered but rejected a proposal for periodic review every two years in favor
of the longer five-year review interval.  H.R. Rep. No. 95-294, at 10, 179-83 (1977), *reprinted in*
1977 U.S.C.C.A.N.  1077, 1088, 1258-62; H.R. Rep. No. 95-564, at 124 (1977), *reprinted in*
1977 U.S.C.C.A.N. 1502, 1504-05.

26

27

28

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                    12

1

2

**I.    THIS COURT SHOULD ADOPT THE SCHEDULE PROPOSED BY EPA; ANY SHORTER SCHEDULE WOULD UNDERMINE EPA'S ABILITY TO PROMULGATE SCIENTIFICALLY SOUND STANDARDS**

3

4

5

6

7

8

9

        To aid the Court in evaluating feasibility, EPA has identified the tasks it deems necessary to a rigorous review of the air quality criteria and NAAQS.  The sequencing of these tasks and the minimum amount of time needed to accomplish them are discussed in the accompanying declaration of Stephen Page and depicted graphically in Attachment B to Mr. Page's declaration. Page Decl. ¶¶ 49-58; Att. B to Page Decl.  None of the steps described can be omitted without violating applicable procedural requirements or compromising the scientific soundness of the review.  Page Decl. ¶ 59.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

        Based on this step-by-step analysis, EPA would (1) issue a final science assessment document for CO by May 28, 2010; and (2)(a) sign by October 28, 2011, either (i) a proposed rule containing new standards or revisions to the CO NAAQS as may be appropriate in accordance with 42 U.S.C. § 7409(b), or (ii) a proposed or final determination not to revise such standards; and (b) sign by July 27, 2012, a final rule containing new standards or revisions to the CO NAAQS as may be appropriate in accordance with 42 U.S.C. § 7409(b), unless a final determination not to revise such standards has been issued on or before July 27, 2012.  *Id.* ¶ 50. Under this schedule, EPA's rulemaking would be completed in four years and ten months from the call for information, which was issued on September 13, 2007.[9]/  EPA's proposed schedule properly reflects the nature, complexity, and importance of the scientific and technical issues involved.  *See* 42 U.S.C. § 7408(a)(2) (directing EPA to set air quality criteria that *"accurately reflect the latest scientific knowledge"* (emphasis added)); *Train*, 510 F.2d at 712-13 (identifying the need to sufficiently evaluate complex technical issues as a circumstance that might necessarily delay agency action).

24

25

        The longest segment of the timeline – 32 months – is devoted to the science assessment.

26

27

28

[9]/    Both EPA and Plaintiffs agree that the September 13, 2007 call for information initiated the NAAQS review process, and that intervals should be measured from that date  Pl. Mem. at 8, 11.

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                                    13

1    This is consistent with EPA's recent efforts to restructure the NAAQS review process, *see*

2    *generally* Page Decl. ¶¶ 23-30, and with the level of effort that other courts have recognized as

3    reasonable for the science assessment phase of other NAAQS reviews.  The most recent consent

4    decree schedule for a NAAQS science assessment allows 31 months for completing a science

5    assessment for the review of the primary NAAQS for nitrogen dioxide ("$NO_2$") and 28 months

6    for completing an assessment for the review of the primary NAAQS for sulfur dioxide ("$SO_2$").

7    The schedule also allows a total of 36 months for completing a science assessment in connection

8    with a joint review of the secondary standards for nitrogen dioxide and sulfur dioxide.  *See*

9    *Center for Biological Diversity v. Johnson* (Att. C to Howekamp Decl. in Support of Pl. Mot. for

10   Summary J. ¶ 1(g)).

11          Although EPA will initiate the exposure/risk assessment while the science assessment is

12   underway, the completion of the two phases will be staggered.  The science assessment must be

13   completed first, so that the exposure/risk assessment can build upon the findings of the final

14   science assessment.  Page Decl. ¶ 56.  Without the benefit of a completed science assessment, an

15   exposure/risk assessment would be of limited utility.  There is some overlap in the preparation of

16   the science assessment and the *first draft* of the exposure/risk assessment, but it is incorrect to

17   assume, as Plaintiffs do, that "the risk/exposure assessment drafts and final document are

18   prepared in parallel with the science assessment."  Howekamp Decl. ¶ 8.

19          EPA's proposed schedule builds in adequate time for the independent scientific review

20   committee ("CASAC") and interested parties to review and comment, as required by the Act.

21   EPA's schedule is also consistent with the five-year review period for the review of NAAQS

22   provided for in 42 U.S.C. § 7409(d).   EPA will also be engaged in review of the other NAAQS

23   during this time frame, and must coordinate not only the efforts of the Agency but also the

24   reviews by CASAC over the entire review frame.  Attachment A to the Declaration of Stephen

25   Page contains a chart that shows EPA's proposed NAAQS review activities during the years

26   2007-2011.  *See also* Ross Decl. ¶ 2; Declaration of Dr. Karen Martin ("Martin Decl.") ¶ 2.

27          Given the important public health and welfare interests at stake, and the intense focus

28

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                    14

1    placed on these issues given the economic and other interests of various public commenters, the

2    public interest favors a schedule that allows EPA to meet the Agency's internal standards for

3    quality and completeness.  The public interest would not be served by adopting a schedule that

4    punishes the Agency for having missed a statutory deadline.  If EPA were compelled to issue air

5    quality criteria that did not "accurately reflect the latest scientific knowledge," 42 U.S.C. §

6    7408(a)(2), and were compelled to promulgate a CO NAAQS based on a truncated review, the

7    public health benefits Plaintiffs hope to realize through completion of a CO NAAQS review

8    would not be realized.

9        Plaintiffs incorrectly assume that any schedule longer than the expedited one they propose

10    would allow EPA to "dall[y] away in open defiance of a Congressional mandate."  Mem. in

11    Support of Pl. Mot. For Summary Judgment at 15.  Although Plaintiffs are understandably

12    frustrated by EPA's progress to date with regard to the review of the CO NAAQS, Plaintiffs'

13    attempt to vilify the Agency is misguided.  The timetable proposed by EPA is offered in good

14    faith, and EPA believes a shorter schedule would require shortcuts that would undermine either

15    the benefits or the defensibility of the NAAQS review and thereby not serve the statutory purpose

16    of the review.  Page Decl. ¶ 49.

17        Plaintiffs urge that "a sufficiently expeditious schedule is necessary because of the severe

18    and widespread harm that these pollutants inflict."  Pl. Mem. at 13.  However, Plaintiffs' claim of

19    "severe and widespread harm" from carbon monoxide in ambient air is speculative in light of the

20    full range of scientific evidence and current ambient concentrations.  According to the most

21    recent available data, ambient CO concentrations measure 3 ppm or less at 90 percent of the

22    monitors in the nation, with the average ambient CO concentration being 2 ppm.  Page Decl. ¶

23    40.  By comparison, average CO levels in homes without gas stoves vary from 0.5 to 5 ppm, and

24    levels near properly adjusted gas stoves are often 5 to 15 ppm.[10]/  Plaintiffs' layman's views

25    regarding outdoor air quality lack sufficient basis in fact to justify compressing EPA's

26    
_____

27    [10]/    *See* "EPA Indoor Air Quality, Basic Information, Carbon Monoxide,"
       http://www.epa.gov/iaq/co.html.

28    

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                    15

1    administrative rulemaking process in a way that could undermine the scientific integrity of the

2    final result.[11]/ Given that other regulatory programs will secure additional reductions in CO

3    emissions in the coming years, Page Decl. ¶ 41, public health will continue to be protected during

4    the pendency of a CO NAAQS review that corresponds with EPA's proposed schedule.

5        In short, EPA's proposed schedule is consistent with the legislative mandate and is

6    feasible.  A July 12, 2012 deadline for taking final action on the CO NAAQS review balances

7    Plaintiffs' need for assurance that EPA will comply with its statutory mandate with EPA's need

8    to follow procedures that will assure confidence in the soundness of the final outcome.

9    **II.    THE COURT SHOULD REJECT PLAINTIFFS' PROPOSED REMEDY**

10       **A.    Plaintiffs' Schedule Is Unreasonable**

11       In support of their competing schedule, Plaintiffs proffer the declaration of David

12   Howekamp, who was the Director of the Air Division of EPA Region 9 from 1982 to 2000.  In

13   that capacity, Mr. Howekamp managed federal rulemakings pertaining to state and federal

14   implementation plans.  However, the issues of implementation are different from NAAQS

15   reviews in both substance and scale.  Unlike NAAQS reviews, which are directed at evaluating

16   the appropriateness of a nationwide standard, implementation plan rulemakings seek to identify

17   specific measures that can be used in a particular geographic area to reduce emissions to a level

18   below the applicable NAAQS.[12]/ Significant procedural differences exist as well.  For example,

19

20   [11]/    It is premature for Plaintiffs to assume that a revision to the primary standard is needed to

21   protect public health with an adequate margin of safety.  That question can not be decided until
     the comprehensive review of the science has been completed, advice has been received from

22   CASAC, and the Administrator has exercised his judgment after full notice and comment

23   rulemaking.

24   [12]/    As explained by the D.C. Circuit:

25       Once EPA establishes NAAQS for a particular pollutant, the standards become

26       the centerpiece of a complex statutory regime aimed at reducing the pollutant's
         atmospheric concentration.  EPA and the States must first designate areas of the

27       country that fail to meet the standards - that is, areas in which atmospheric

                                                                           (continued...)

28

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                          16

1   rulemakings regarding implementation plans do not require solicitation of recommendations and

2   advice of an independent scientific committee like CASAC.  Mr. Howekamp is undoubtably very

3   familiar with both NAAQS and implementation issues.  There is nothing in his declaration,

4   however, that shows he participated in promulgating any regulation of nationwide applicability,

5   much less a review of air quality criteria and NAAQS.  Because Mr. Howekamp's opinions

6   regarding the time necessary to complete a NAAQS review are not founded upon personal

7   knowledge or experience, those opinions are insufficient to support a finding that Plaintiffs'

8   schedule is reasonable.

9        Even if Mr. Howekamp were qualified to offer an opinion as to a reasonable schedule, his

10  analysis is flawed.  As previously explained, the science assessment and exposure/risk

11  assessment must be staggered so that the latter can build upon the conclusions of the former.

12  Indeed, the generic schedule cited by Mr. Howekamp shows that the exposure/risk assessment is

13  completed 7.5 months following the completion of the science assessment.  Mr. Howekamp

14  nonetheless states that these two phases can be done "in parallel," Howekamp Decl. ¶ 7, and his

15  resultant schedule leaves no opportunity for EPA to factor the findings of the science assessment

16  into the exposure/risk assessment.  To complete these two assessments simultaneously, as

17  Plaintiffs urge, is neither constructive nor feasible.

18       Further, although Mr. Howekamp contends that the CO NAAQS is comparable in

19  complexity to the $NO_2$ and $SO_2$ NAAQS, Howekamp Decl. ¶ 7, *see also* Pl. Mem. at 10, he

20

21  [12]/    (...continued)

22       concentrations of the pollutant exceed allowable levels.  42 U.S.C. §

23       7407(d)(1)-(2).  Each State must then adopt a plan that "provides for
         implementation, maintenance, and enforcement of [the] primary" NAAQS, *id.* §

24       7410(a)(1), through, for example, regulation of wood fires or automobile or power
         plant emissions.  States must submit their plans to EPA for approval, and may

25       have to make revisions if the Agency finds the plans inadequate.  States that fail to

26       develop adequate plans are subject to sanctions, id. § 7509, or to imposition of a
         federal implementation plan, *id.* § 7410(c)(1).

27

28  *American Trucking Ass'ns, Inc. v. EPA*, 283 F.3d 355, 358-359 (D.C. Cir. 2002).

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                    17

1  would give EPA far less time to complete the science assessment here than EPA was allowed

2  under the consent decree governing the review of the NOx and SOx NAAQS.  *Compare*

3  Howekamp Decl. ¶ 7 *with* Att. C to Howekamp Decl., ¶ 1(g).  Specifically, Mr. Howekamp

4  suggests that EPA should have only 23.5 months from the call for information to complete the

5  science assessment portion of the CO NAAQS review, while the NOx and SOx consent decree

6  consistently gave EPA more time to accomplish that component of the review for the four

7  standards addressed in the decree:  31 months for the science assessment for the primary NAAQS

8  for $NO_2$, 28 months for the primary NAAQS for $SO_2$, and 36 months for the joint review of the

9  secondary standards for both pollutants.  Mr. Howekamp does not explain how the longer

10  intervals in the consent decree demonstrate the reasonableness of imposing a shorter schedule for

11  a science assessment here.[13]/

12      Plaintiffs point to the district court's decision in *American Lung Ass'n v. Browner*, 884 F.

13  Supp. 345, 349 (D. Ariz. 1994), as evidence that compliance with their schedule is feasible.  Pl.

14  Mem. at 9.  Plaintiffs' portrayal of *American Lung Ass'n* as an object lesson is misguided for

15  three reasons.  First, Plaintiffs incorrectly surmise that the EPA completed the particulate matter

16  NAAQS review in less than three years.  In fact, as noted in the opinion, EPA started the review

17  in October 1993, *American Lung Ass'n*, 884 F. Supp. at 349, and EPA concluded the

18  administrative process on July 18, 1997, *see* 62 Fed. Reg. 38,652 (July 18, 1997), a total of three

19  years and nine months.  Further, the initial schedule ordered by the court proved to be inadequate

20  and was extended by the court four times, thrice in response to joint motions by all parties and

21  once in response to EPA's motion.  *See* Civil Docket for Case # 4:93-00643-ACM, attached

22  hereto as Ex. 1, docket nos. 104-116; *see also* 62 Fed. Reg. at 38,654 n.2.  The repeated

23  extensions were required because the court's original timeline allowed CASAC to review only

24  one draft of the criteria document (now called the integrated science assessment).  As the review

---

[13]/    Contrary to the views of both Plaintiffs and EPA, Mr. Howekamp assumes that the appropriate starting point for the schedule is Plaintiffs' Notice of Intent, mailed April 26, 2007, rather than the call for information published September 13, 2007.  Howekamp Decl. ¶¶ 6-7.

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                                    18

1  of particulate matter NAAQS proceeded, the necessity of preparing more than one draft became

2  obvious, and the court agreed to modify the order so that EPA could have the benefit of

3  CASAC's independent scientific review of multiple drafts.  Finally, despite the extensions,

4  which gave EPA an additional 6 months to complete its rulemaking, the coarse particle standard

5  issued by EPA was later vacated and remanded by the D.C. Circuit.  *See American Trucking*

6  *Ass'ns v. EPA*, 175 F. 3d 1027, 1054-55 (D.C. Cir. 1999).

7  EPA disagrees with Plaintiffs' assertion that their proposed three-year and five-month

8  schedule (beginning on September 13, 2007 and concluding on February 11, 2011) is consistent

9  with the deadline imposed by the district court decision in the lead NAAQS case.  Pl. Mem. at

10  10.  In that case, the court's order required that EPA conclude its review and revision within

11  three years and ten months from the start of the proceedings.  *Missouri Coalition for the*

12  *Environment v. EPA*, No. 4:04-cv-660, 2005 WL 2234579 at *4 (E.D. Mo. Sept. 14, 2005).

13  Thus, the case does not support Plaintiffs' request for *less time* in which to conduct the CO

14  NAAQS review.  To the extent that Plaintiffs believe the lead NAAQS review will be completed

15  within a three-year period, they are mistaken.

16  Finally, there is no merit to Plaintiffs' statement that "except at the highest levels of

17  agency management, different EPA personnel carry out the review process for different

18  pollutants."  Pl. Mem. at 11.  In fact, all of the personnel assigned to the CO NAAQS review are

19  currently working on ongoing NAAQS reviews for other criteria pollutants, and in some cases

20  they are working on reviews of all of the criteria pollutants.  Martin Decl. ¶ 2; Ross Decl. ¶ 3.

21  **B.    Plaintiffs Request Relief Beyond That Authorized by Statute**

22  EPA also objects to Plaintiffs' request for an order specifying a series of intermediate

23  deadlines, *see* Pl. Mem. at 8, because such relief exceeds this Court's authority.[14]/  Under the

24  CAA citizen suit provision, 42 U.S.C. § 7604(a)(2), the Court's authority to remedy any failure

25

26  [14]/    Specifically, Plaintiffs ask the Court to order EPA to (1) complete a science assessment
27  support document by April 14, 2008, and (2) complete the risk/exposure assessment "in parallel
with the science assessment."  *See* Pls. Mem. at 8.
28

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                    19

1  by EPA to comply with a non-discretionary duty is limited to imposing a deadline for EPA to

2  discharge that duty.

3      The United States can be sued only if it has consented to be sued, and that consent must

4  be found in a clear, unequivocal, and specific statement in the text of the statute at issue. *See*,

5  *e.g.*, *United States Dep't of Energy v. Ohio* ("*DOE v. Ohio*"), 503 U.S. 607, 615 (1992). The

6  waiver of sovereign immunity "'cannot be implied but must be unequivocally expressed,'" *Army*

7  *& Air Force Exch. Serv. v. Sheehan*, 456 U.S. 728, 734 (1982) (quoting *United States v. Testan*,

8  424 U.S. 392, 399 (1976)), and may not be "enlarged beyond what the language requires." *DOE*

9  *v. Ohio*, 503 U.S. at 607 (internal citation omitted). Even when Congress enacts a statute that

10  waives the sovereign immunity of the United States in some circumstances, the statute must be

11  construed narrowly and strictly in the sovereign's favor. *See*, *e.g.*, *DOE v. Ohio*, 503 U.S. at 615,

12  620-28. These requirements go directly to a court's jurisdiction to hear an action and award

13  relief against the United States. *First Virginia Bank v. Randolph*, 110 F.3d 75, 77 (D.C. Cir.

14  1997).

15      Like the waiver of immunity to suit itself, a waiver of immunity as to a particular remedy

16  also must be "unequivocally expressed" and "will not be implied." *Lane v. Pena*, 518 U.S. 187,

17  192, 196-97 (1996). These principles apply to the evaluation of available remedies against the

18  United States under citizen suit provisions in environmental statutes, such as the Clean Air Act at

19  issue here. *See*, *e.g.*, *DOE v. Ohio*, 503 U.S. at 615-19 (applying sovereign immunity principles

20  in evaluating availability of civil penalty remedies under citizen suit provisions of the CWA and

21  Resource Conservation and Recovery Act).[15]/

22      The only jurisdictional basis for Plaintiffs' claims regarding EPA's failure to timely

23  review and revise the CO criteria and NAAQS is the CAA's citizen suit provision, 42 U.S.C. §

24  7604(a)(2), and the only remedy available for a breached non-discretionary duty under that

25

26  [15]/    The Supreme Court has consistently interpreted analogous citizen suit provisions of
   federal environmental statutes similarly. *DOE v. Ohio*, 503 U.S. at 615; *Hallstrom v. Tillamook*
27  *County*, 493 U.S. 20, 23 n.1 (1989) (noting that most of the citizen suit provisions in
   environmental statutes were modeled after similar provisions in the Clean Air Act).
28

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                    20

provision is a court order directing EPA to perform such duty.  Specifically, the citizen suit

provision as a whole defines three separate rights of action, of which the non-discretionary duty

provision is one, each with an attendant remedial provision specifying the scope of the Court's

remedial authority and discretion for each specific action.  The right of action relevant here

allows suit against the Administrator where there is alleged a failure to perform any non-

discretionary act or duty under the CAA.  42 U.S.C. § 7604(a)(2).  The provision goes on to state

that the "district courts shall have jurisdiction, without regard to the amount in controversy or the

citizenship of the parties . . . *to order the Administrator to perform any such act or duty*."  *Id.*

(emphasis added).  Thus, for suits alleging an EPA failure to perform a non-discretionary duty in

this context, Congress limited the waiver of sovereign immunity to one remedy:  ordering EPA to

perform the unsatisfied duty.  An injunction providing additional relief falls outside this limited

waiver.

Aside from the sovereign immunity issue, any suggestion that this Court should order

EPA to conduct particular activities as part of its review and revision process would violate

traditional statutory construction canons related to remedy.  It is an "elemental canon of statutory

construction that where a statute expressly provides a particular remedy or remedies, a court must

be chary of reading others into it.'"  *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers*

*Ass'n*, 453 U.S. 1, 15-16 (1981) (quoting *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444

U.S. 11, 19 (1979)).  "In the absence of strong indicia of a contrary congressional intent, we are

compelled to conclude that Congress provided precisely the remedies it considered appropriate."

*Middlesex County*, 453 U.S. at 15.  These limiting principles apply fully to determining whether

the express remedy provided by Congress is intended to be the exclusive remedy.  *See*, *e.g.*,

*Gov't of Guam v. Am. President Lines*, 28 F.3d 142, 145-46 (D.C. Cir. 1994).  Here, the citizen

suit provision provides a specific remedy for a failure to perform a non-discretionary duty, which

is to order that duty to be performed.  Any additional remedy cannot be squared with the doctrine

of sovereign immunity or with the principle that courts generally are limited by the specific

remedies legislated by Congress.

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                    21

In *Lane v. Pena*, 518 U.S. at 196-97, the Supreme Court considered whether monetary damages were available against the United States for a violation of the Rehabilitation Act of 1973, 29 U.S.C. §§ 791-794(e), even though no such remedy was specifically identified in the statute. The plaintiff in *Lane* claimed that the courts retained the authority to award money damages because Congress had provided for "all appropriate remedies" in the statute. But the Court held that "where a cause of action is authorized against the federal government, the available remedies are not those that are 'appropriate,' but only those for which sovereign immunity has been expressly waived." *Lane*, 518 U.S. at 197. The Court concluded that it would contravene sovereign immunity principles to infer that Congress intended additional remedies against the government beyond those expressly provided. *Id.* Similarly, here, Congress provided that the remedy for an EPA failure to perform a non-discretionary duty is "to order the Administrator to perform such act or duty." Any injunction prescribing the performance by EPA of specific tasks or publication of specific documents as part of its review would exceed this express waiver of sovereign immunity.

This is not to say that a district court lacks all equitable discretion to fashion an appropriate remedy for a CAA deadline violation. A court may consider the complexity of the task at hand, EPA's budget, resource constraints, and similar factors in developing a reasonable deadline for the Administrator to perform a non-discretionary duty. Put another way, a district court retains discretion to set an appropriate and reasonable time for the discharge of the specific duty mandated by the statute. However, the courts do not have equitable discretion under the CAA citizen suit provision to issue an injunction against EPA that would dictate the procedures that EPA will follow in reviewing and revising the CO NAAQS and the associated air quality criteria.[16]/

---

[16]/    It is a "very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 544 (1978). Thus, where Congress has accorded responsibility for making a substantive judgment to an agency, the formulation of procedures for reaching that

(continued...)

EPA's Mem. in Support of Cross-Mot. for
Summ. J. on Remedy/Opp. to Pls' Summ. J. Mot.
Case No. 07-3678 JSW                                22

1    Finally, Plaintiffs' proposed order improperly requests that the Court impose a deadline

2    of February 11, 2011 for completion of "all tasks necessary for implementation."  Pl. Proposed

3    Order at 3.   An order addressing implementation activities is inappropriate because Plaintiffs

4    have not alleged in their complaint that EPA failed to perform any mandatory duty concerning

5    implementation of the NAAQS.  Therefore, questions pertaining to implementation are not

6    properly before this Court.  In any event, there is no basis for setting a deadline for EPA to

7    complete implementation activities that would ordinarily occur after revision of the NAAQS.

8                                           **CONCLUSION**

9            WHEREFORE, for the reasons stated above and in the accompanying declarations of

10   Stephen D. Page, Dr. Mary Ross, and Dr. Karen Martin, EPA's cross-motion for summary

11   judgment on remedy should be granted, and the Court should enter an order requiring EPA to (1)

12   complete a final science assessment updating the air quality criteria for CO by May 28, 2010; and

13   (2) (a) sign on or before October 28, 2011, one of the following: (i) a proposed rule containing

14   new standards or revisions to the CO NAAQS as may be appropriate in accordance with 42

15   U.S.C. § 7409(b), or (ii) a proposed or final determination not to revise such standards; and (b)

16   sign on or before July 27, 2012, a final rule containing new standards or revisions to the CO

17   NAAQS as may be appropriate in accordance with 42 U.S.C. § 7409(b), unless a final

18   determination not to revise such standards has been issued on or before July 27, 2012.

19                                    Respectfully submitted,

20                                    RONALD J. TENPAS
                                     Assistant Attorney General
21                                    Environment & Natural Resources Division

22   Date: December 7, 2007           /s/ Pamela S. Tonglao
                                     PAMELA S. TONGLAO
23                                    Trial Attorney
                                     United States Department of Justice
24                                    Environmental Defense Section
                                     P.O. Box 23986
25                                    Washington, D.C. 20026-3986
                                     Tel:    (202) 305-0897
26                                    Fax:    (202) 514-8865

27   _____

28   [16]/    (...continued)
     substantive judgment are generally to be "left within the discretion of the agenc[y]."  *Id.* at 524.

                                            23

1    Email: pamela.tonglao@usdoj.gov

2    ATTORNEYS FOR DEFENDANTS

3    OF COUNSEL:

4    DAVID P.W. ORLIN
     Air and Radiation Law Office
5    Office of General Counsel
     U.S. Environmental Protection Agency
6    Mail Code 2344A
     1200 Pennsylvania Avenue, N.W.
7    Washington, DC 20460

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22                        CERTIFICATE OF SERVICE

23        On December 7, 2007, a true and correct copy of the foregoing  was served electronically

24   via the Court's e-filing system to Counsel of Record.

25

26                            /s/ Pamela S. Tonglao
27                            PAMELA S. TONGLAO

28